[No. 22759.   Department Two.   July 24, 1931.]

DRYDEN LOCAL GROWERS, *Appellant,* v. B. E. DORMAIER *et al., Respondents.*[1]

[1]Reported in 2 P. (2d) 274.

*Hughes & Hughes* and *W. W. Zent,* for appellant.
*A. N. Corbin,* for respondents.

FULLERTON, J.—The appellant, Dryden Local Growers, is a corporation, organized under the general incorporation laws of the state of Washington. The respondents Dormaier, the respondents Harnden, and the respondents Krause, severally entered into contracts with it, the purport and nature of which will presently be made to appear. The appellant brought three separate actions against the respondents to recover liquidated damages as for a breach of contract. The determinative facts in the several cases being the same, the actions were consolidated for trial in the court below, and tried as one action. The judgments went against the appellant, and it appeals from the several judgments. By stipulation of counsel and with the consent of the court, the appeals were heard here as one, and will be so considered now.

The respondents are fruit growers, having orchards near and in the vicinity of Dryden, in Chelan county. Under date of January 20, 1925, the respondents severally, as parties of the first part, entered into written agreements with certain named persons, as parties of the second part, wherein it was recited that the parties of the second part contemplated forming a general corporation having a capital stock of sixty thousand dollars, divided into shares of the par value of ten dollars each, to be designated by the name of Dryden Local Growers, or some other suitable name, for the purpose of taking over the property and assets of another concern doing a warehousing and storage business at Dryden, and installing in addition thereto, if possible, a cold storage plant for the storage of fruit and other products. The agreement then continued as follows:

"THEREFORE: In consideration of the premises and in consideration of the second parties causing said corporation to be formed and organized, each of the undersigned separately and for himself agrees with the second parties that on demand of the first [second] parties, or their officers after said new corporation is organized, he will take, receive and pay for the following amount of the total capital stock of said corporation, to-wit:

"That he will subscribe, accept and pay for such proportional amount of the total capital stock of said corporation as the number of bearing acres of orchard written opposite the undersigned's name below bears to the total number of acres of bearing orchard written opposite the names of all the second [first] parties who have signed this instrument, or similar instruments whereby they subscribe for shares of stock in said corporation when formed.

"It is expressly understood, however, that each of the undersigned subscribers to said capital stock shall have the right to pay the amount of his subscription hereunder, or any part thereof, either in cash or by executing his note, payable to said corporation, bearing interest at the rate of seven per cent. per annum from date thereof, payable annually for the amount of the purchase price of said capital stock, and to pay said note by paying thereon a sum equivalent to five cents per box on all marketable apples grown or owned by him each year hereafter commencing with the crop of 1925. All of said note, with all accrued interest thereon, to be paid in full in any event on or before eight years from date hereof."

After the execution of the agreement, the parties named therein as parties of the second part, organized the corporation therein contemplated, and the respondents subscribed for shares of the capital stock of the corporation and gave their notes for the amounts of their subscriptions in accordance with the terms of the agreement. The notes contained a provision to the effect that default in any of the instalment payments

therein provided should render the whole note due and payable at the option of the holder. They contained no requirement that the apples grown by the makers should be delivered to the payee of the note, and no provision relating to liquidated damages.

The respondents, after the organization of the corporation, severally entered into agreements with it. The agreements are alike in form. We set forth the contract entered into with the respondents Dormaier as representative of the others. It reads as follows:

"THIS AGREEMENT, Made and entered into this 6th day of March, 1925, by and between B. E. Dormaier, of the County of Chelan, State of Washington, whose post office address is Cashmere, Route No. 2, Washington, hereinafter called the 'GROWER,' party of the first part, and DRYDEN LOCAL GROWERS, a corporation, organized and existing under and by virtue of the Laws of the State of Washington, hereinafter called the 'LOCAL,' party of the second part, WITNESSETH:

"That the Grower, in consideration of the advantages derived therefrom, and in consideration of the services rendered to him by the Local, as hereinafter set forth, hereby appoints and employs the said Local on the terms and under the conditions hereinafter set forth, to handle all his fruit which shall be grown for shipment upon that certain tract or tracts of land, situated, lying and being in the County of Chelan, State of Washington, and described as follows, to-wit:

"River Glen Orchard, Section 2, Township 2, No. Range 18, E. W. M., together with all his fruit which may be grown for shipment upon any and all other tracts of land situated in the vicinity of Dryden, Washington, and in which the Grower may be interested as Landlord or Tenant, during the year 1925, and for every year thereafter, unless this contract is terminated in the manner provided therefor by the By-Laws of said Local, and the Grower further agrees that during the life of this contract he will on demand execute and deliver to the Local a lien on all fruit crops to be grown on the above described land for such year, as security for any and all moneys advanced or to be

advanced, supplies furnished to the Grower, accounts due or that shall become due from said Grower to the Local during the year in which the lien is demanded by the Local.

"It is further agreed, by and between the parties hereto: That on or before April 15th of each and every year during the life of this contract, the Grower shall sign, execute and deliver to the Local an instrument designating in which or under which one of four classes of service he desires his fruit handled, as follows, to-wit: Service No. 1, Service No. 2, Service No. 3, or Service No. 4, which are hereinafter fully defined and set out. And that said instrument, when so signed, executed and delivered, shall be attached to and become a part of this contract.

"And it is further agreed: That the four different classes of service hereinabove quoted are defined as follows:

"Service No. 1 shall include grading, packing, inspection and warehousing. The grading, packing and inspection shall be done at cost, cost to include, among other elements, all overhead expense, such as the rent of plant, depreciation of plant, interest on borrowed money, clerical expense, administrative expense and such other expense incident to the above mentioned operation as may be designated by the Board of Trustees. The charge for warehousing shall cover all warehousing and clerical work, together with any and all overhead expense pertaining to or incident to that particular operation, and the warehousing charge shall be determined each year by the Board of Trustees. The grading, packing and inspection service shall be optional with the Local, as hereinafter provided.

"Service No. 2 is intended to cover only warehousing service, and in this connection it is agreed and understood that the warehousing operation shall include the receiving of the fruit at warehouse door, issuing door receipt therefor, properly loading fruit to car, checking the same as to varieties, grades and sizes, and issuing manifests thereof. The same designation to apply as to expenses and the method of arriving at the charge pertaining to this service as set up in Service No. 1 for 'warehousing.'

"Service No. 3 shall include grading, packing, inspection, warehousing and cold storage. The provisions mentioned hereinabove for arriving at the cost of grading, packing, inspection, warehousing in Service No. 1 and Service No. 2, shall likewise apply as to Service No. 3. In selecting Service No. 3, the Grower shall notify the Local not later than September 2nd each year, the number of boxes of apples and pears which he shall desire to have cold stored hereunder at the regular seasonal rate therefor to be charged by the Local. The grading, packing and inspection service shall be optional with the Local, as hereinafter provided.

"Service No. 4 shall be identical with Service No. 2, with the inclusion of cold storage service. In case Grower selects this service, he shall notify the Local not later than September 2nd each year, the number of boxes of apples and pears which he shall desire to have cold stored hereunder at the regular seasonal rate therefor to be charged by the Local.

"It is expressly understood and agreed that it shall be optional with the Local whether it will make available for and extend to the Grower in any year the service of grading, packing and inspection as specified herein under Services No. 1 and No. 3. The Local shall, however, have until May 1st each year in which to determine and notify the Grower in writing whether it will render the Grower requesting same said service of grading, packing and inspection in that year.

"In the event that there shall not be sufficient cold storage space available to supply all reservations made therefor, under the provisions of Service No. 3 and Service No. 4, together, then and in that event, the Local shall have the right to pro-rate the space among the growers requesting cold storage service under Service No. 3 and Service No. 4, together, in direct proportion to space originally requested by each of the said growers under Service No. 3 and Service No. 4, together, as provided herein, and the Grower agrees that he will take, use and pay for his pro-rata share under the above provisions at the regular seasonal rate per box to be charged by the Local for cold

654

storage. In any event, it is hereby agreed that apples or pears stored loose in boxes shall be regarded nevertheless as a unit box and shall bear the regular per box charge therefor.

"If any Grower shall fail to notify the Local, in writing, on or before April 15th in any year during the life of this contract, as provided hereinabove, as to which of the above optional services he desires for his crop, then and in that event, the Local will understand that the crop is to be handled under Service No. 2, which includes only warehousing service.

"The Grower agrees, in any event, with the Local, that he will pay to the Local the sum of 25 cents per box for breach of this contract by failure to deliver all of the crop of apples by him hereunder obligated to deliver to the Local during any year, and that the Local may, at its option, bring legal action against the Grower for the recovery of the said amount.

"It is further agreed: That the failure of the Grower to deliver said crop to the Local will result in damages to the Local in the amount of 25 cents per box, and that the sum of 25 cents per box is the amount necessary to repay the Local for moneys expended and expenses incurred in arranging and preparing to handle the fruit of said grower, and that the said sum of 25 cents per box is in reality liquidated damages and not a penalty; and that in the event the Local is compelled or obligated to bring suit to recover the amount of 25 cents per box, that in such event, the Local shall be allowed its costs and a reasonable attorney's fee in such suit, to be fixed by the Court.

"It is further agreed: That the Grower, in accepting any one of the classes of service hereinabove mentioned, shall pay for such service at the price or charge therefor which shall be determined for the particular season by the Board of Trustees, and that the Grower shall have the returns from the sale of his fruit paid to the Local and from the proceeds thereof the Local shall deduct all moneys due it from the Grower for materials or supplies furnished, money advanced, or services rendered to the Grower, or, that the Grower shall make timely and proper arrangements, satisfac-

tory to the Local, for securing the Local adequately for such materials or supplies furnished, money advanced or services rendered the Grower.

"It is further understood and agreed by the parties hereto: That each of the parties hereto is fully bound by all of the provisions of the By-Laws of the Local, which are hereby made a part of this contract by reference hereto as fully as if herein set out. . . ."

The by-laws of the corporation, which are referred to in this agreement and made a part of it, contained the same provisions as the agreement with respect to the classes of service the corporation was to furnish its stockholders, the terms and conditions upon which the service would be furnished, and the penalties to which stockholders would be subjected for failure on their part to perform the contract. In addition to these provisions, the bylaws contained the following sections:

"All stockholders under contract shall use one of the four classes of service provided for hereinbelow. If any stockholder shall fail to use one of the four services below mentioned, then his stock subscription note shall become immediately due and collectible at the option of the holder thereof. There shall be a continuous contract running from year to year entered into between the corporation and the stockholder, but the stockholder shall have the privilege of cancelling the contract at any annual meeting when his entire indebtedness to the corporation, including the above mentioned stock subscription note, is settled in full."

"The Trustees of the corporation are required to handle all fruit grown by stockholders of the corporation on acreage for which they have subscribed for stock, but it is optional with the said Board of Trustees whether they handle any fruit on acreage for which stock has not been subscribed and it is also optional with the Board of Trustees whether or not they handle fruit for persons who are not stockholders of the corporation."

The respondents delivered to the appellant their fruit crops during the seasons of 1925 and 1926, selecting the service designated in the agreement and in the by-laws as service No. 2. The services rendered and the returns made for the season of 1925 seem to have been satisfactory to the respondents; at least, no complaint is made as to services or returns for that year. However, sometime between the seasons of 1925 and 1926, the appellant made additions to its plant and otherwise increased its capital investment; and, in order to obtain funds with which to meet the expenditures so entailed, the appellant, without the consent or concurrence of the respondents, and against their protests, levied on each box of fruit delivered to it by the respondents, in addition to the agreed charges for warehousing the fruit, a sum slightly less than eleven cents, and withheld the amounts thereof from the proceeds of sales of fruit of the respondents, sending them paid-up certificates of stock in the corporation for the amounts of the deductions.

It being the apparent purpose of the appellant to make like deductions for succeeding seasons during the existence of the contracts, the respondents, prior to the opening of the fruit season of 1927, gave a written notice to the appellant that they were dissatisfied with these deductions, and that, so long as the deductions were continued, they would not deliver their fruit to the appellant, stating, however, that they would continue to pay the five cents per box upon their stock subscription notes. The appellant would not admit that the deductions were arbitrary, and would not promise to discontinue them; and hence the respondents, for the years 1927 and 1928, withheld their fruit from the appellant and had it handled by another or other concerns. These three actions for liquidated damages were then brought, as above stated.

■ The trial court held that the appellant breached its contracts with the respondents, and therefore they were justified in refusing thereafter to deliver their fruit to the appellant as required of them by the contracts. In this we think the court was right. The respondents had subscribed for definite amounts of stock and paid for it by giving their notes, all precisely as provided for in the contracts. There was no obligation put upon them by the contracts or otherwise to subscribe or pay for any additional stock, and the withholding by appellant of respondents' money for the purpose of compelling them to take more stock than they had subscribed for, or obligated themselves to take, was wholly unwarranted.

The appellant's counsel, as we understand their arguments, do not contend that the appellant had a right to compel the respondents to take additional stock, but they advance two reasons why there was not a breach of contract by the appellant, viz:

(1) The wrongful withholding of the money of the respondents and the application of it to pay for additional stock were acts entirely independent of the contracts, and therefore did not constitute a breach of them; and

(2) If the appellant's wrongful acts were not independent of the contracts, yet the respondents, by retaining the certificates for the additional stock paid for out of the 1926 crop, acquiesced in and ratified the acts of the appellant in withholding the money and applying it upon the stock, and cannot now rely upon those acts as being a breach of the contracts.

■ The first reason urged by the appellant is sufficiently met by calling attention to the next to the last paragraph of the agreement between the appellant and the respondents, as above quoted. The growers were thereby required to let the proceeds from sales of fruit

be paid to the appellant, and the latter was authorized to deduct therefrom all moneys due it for materials or supplies furnished, money advanced and services rendered to the respondents. The necessary implication is that the appellant should make deductions only for the items mentioned, and should pay the entire balance of the proceeds to the owners. The retention of a part of the balance was therefore not independent of the contracts but a clear violation of them.

The second reason advanced by the appellant is also untenable. The appellant not only withheld money out of the crop for the year 1926 and applied it to an unauthorized purpose, but, upon protest by the respondents, persisted in asserting its right to do so, and declared its intention to continue the practice in the future. When the respondents protested against what had been done, and announced that, if the practice was to continue, they would not deliver their fruit to the appellant in the future, the appellant was fully advised that the respondents did not ratify what had been done, and would not let themselves be put in like situations thereafter. The appellant would have been no better informed, and would have been in no better position, if the respondents had tendered back the stock certificates and sued the appellant for the money they represented. The law did not, in these circumstances, require that the respondents resort to litigation to remedy the past wrong in order to assert their right to avoid being wronged in like manner in the future.

We have not overlooked the appellant's suggestion that the evidence shows that the respondents' selling agent received the proceeds of sales of their fruit for 1926, and paid therefrom to the appellant the sums owed to it by them and the sums applied to the additional stock, remitting the balance to the respond-

ents, and that, therefore, the respondents must be deemed to have authorized the stock payments in advance of the actual application of the money. The additional facts about this matter are that the selling agent was a corporation closely allied with the appellant, kept the appellant's books of account, advised the appellant in its business, and was not authorized by the respondents to pay any of their money for stock but did so at the appellant's request. It is obvious that there is no merit in the appellant's suggestion of a previous authorization.

The judgments appealed from are affirmed.

TOLMAN, C. J., BEALS, MILLARD, and BEELER, JJ., concur.

